UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK
------------------------------------------------X
JOHN X. ACOSTA AND INDIA WANEBO,

                                Plaintiffs,

   -against-

THE CITY OF NEW YORK; NYPD LIEUTENANT
SCHMIDT; NYPD OFFICER STEVEN HOLGUIN; NYPD
CAPTAIN RONALD RAMOS; NYPD OFFICER JASON
LOPEZ; NYPD OFFICER ORVIN FELICIANO; NYPD
OFFICER IVAN LUGO; NYPD OFFICER FRANK GREEN;
NYPD OFFICER KRISTOPHER ERICKSON; NYPD
SERGEANT JOSEPH SPALDING; NYPD LIEUTENANT
DAVID VASQUEZ; NYPD OFFICER PRINCE O'CONNOR;
NYPD CAPTAIN HECTOR BARIAS; AND NYPD OFFICER
SYLWIA NOACKI;

                                 Defendants.

------------------------------------------------X

Case No.:
22 CV 576 (FB)(RER)

FIRST AMENDED
**COMPLAINT**


**JURY TRIAL
DEMANDED**

      Plaintiffs JOHN X. ACOSTA AND INDIA WANEBO, by their attorneys,

COHEN&GREEN P.L.L.C. and Gideon Orion Oliver, hereby complain of Defendants as

follows:

## **PARTIES, VENUE AND JURISDICTION**

      1.      At all times mentioned herein, Plaintiff JOHN X. ACOSTA (Mr. Acosta; he/him)

was a resident of Bronx County in the City and State of New York.

      2.      At all times relevant, and INDIA WANEBO (Ms. Wanebo; she/her) was a

resident of Kings County in the City and State of New York.

      3.      At all relevant times mentioned herein, Defendant City of New York ("New York

City") was and is a municipal corporation duly organized and existing under and by virtue of the

laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

4.      Defendants NYPD OFFICER STEVEN HOLGUIN; NYPD CAPTAIN RONALD RAMOS; NYPD OFFICER JASON LOPEZ; NYPD OFFICER ORVIN FELICIANO; NYPD OFFICER IVAN LUGO; NYPD OFFICER FRANK GREEN; NYPD OFFICER KRISTOPHER ERICKSON; NYPD SERGEANT JOSEPH SPALDING; NYPD LIEUTENANT DAVID VASQUEZ;

5.      are collectively referred to herein as the "Acosta Defendants."

6.      Defendants NYPD OFFICER PRINCE O'CONNOR; NYPD CAPTAIN HECTOR BARIAS; AND NYPD MEMBER SYLWIA NOACKI;are collectively referred to herein as the "Wanebo Defendants."

7.      The Acosta and Wanebo Defendants are NYPD members who unlawfully used excessive force, arrested, and/or detained Plaintiffs and others similarly situated in violation of their constitutional rights.

8.      At all times hereinafter mentioned, the Acosta and Wanebo Defendants were employed by the City of New York as members of the NYPD. Some of their true names, as noted throughout this Complaint, are currently unknown to the Plaintiffs.

9.      At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

10.      Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

11.      Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and

authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

12.    Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

13.    At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

14.    Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

15.    Each individual Defendant is sued in her or his individual and official capacities.

16.    This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 1983.

17.    Venue is proper pursuant to 28 U.S.C. § 1391, *et seq.,* in the Eastern District of New York, where the Plaintiffs and Defendant City of New York reside, and where the majority of the actions complained of herein occurred.

18.    Plaintiff WANEBO served a timely Notice of Claim on the municipal Defendant, and sat for a hearing pursuant to New York State General Obligations Law § 50-e.

19.    Plaintiff ACOSTA filed a Notice of Claim on December 29, 2021.

20.    By letter dated December 30, 2021, the Comptroller acknowledged Plaintiff

3

Acosta's claim and scheduled a 50-H hearing, which is scheduled to be held on February 1, 2022.

21.     On January 27, 2022 Plaintiff Acosta initiated a proceeding seeking leave to file a Notice of Claim out of time, including on the basis that the Comptroller had actual notice of his claim by virtue of the other Notices of Claim and lawsuits related to this incident that were timely filed, including the Notice of Claim of Plaintiff Wanebo, and the index number remains unassigned.  That proceeding is pending.

22.     Plaintiffs have initiated this action within one year and ninety days of the accrual of Plaintiffs' claims pursuant to New York State Law, accounting for tolls pursuant to the COVID-19 pandemic.

23.     In the first weeks after COVID-19 became a global crisis, then-Governor Andrew Cuomo issued a series of executive orders, beginning with Exec. Ord. No. 202.8 ("EO 202.8") on March 20, 2020.

24.     EO 202.8 "tolled" "any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding" until April 19, 2020.

25.     In a series of other executive orders, ending with EO 202.67 (and confirmed in EO 202.72), the then-Governor extended the toll through November 3, 2020, such that the tolling period was "no longer in effect as of November 4, 2020."  EO 202.72.

26.     The claims at issue here all arose during the period between March 20, 2020 and November 3, 2020, and therefore the statute of limitations clock did not begin running until November 4, 2020.

27.     The year and 90 day statute of limitations for Plaintiffs' state law claims, which began running on November 4, 2020, thus expires on February 1, 2021 and Plaintiffs' have initiated this action within one year and ninety days of the accrual of Plaintiffs' claims.

## STATEMENT OF FACTS

28.     On October 27, 2020, Plaintiffs were lawfully present at a protest of police

brutality and misconduct on Atlantic Avenue between Boerum Place and Smith Street in Kings

County.

     i.     ***John Acosta.***

29.     At approximately 10:00 p.m., on the sidewalk outside of 288 Atlantic Avenue, in

Brooklyn,  NYPD Lieutenant Schmidt and Officer Holguin created a barrier with their bicycles,

as other members of the NYPD were assaulting protesters.

30.     At this time, Mr. Acosta was filming these NYPD members.

31.     No NYPD members gave Mr. Acosta any order to leave nor said Mr. Acosta was

doing anything unlawful.

32.      Mr. Acosta observed another police officer slam his bicycle into a civilian

cyclist's bicycle.

33.     Mr. Acosta commented on the abusive behavior from the NYPD.

34.     In response to his comments,  NYPD Captain Ramos shoved Mr. Acosta in the

chest and arm, shouting "You are under arrest!"

35.     At this point, Defendants Ramos, Holguin, Lopez, Feliciano, Lugo, Green, and

Erickson, then began striking Mr. Acosta on his body with their hands and batons, and then

dragged Mr. Acosta into the street.

36.     Several of these Defendants pushed down on Mr. Acosta while he was on the

concrete and continued to do so even after Plaintiff told them that he could not breathe.

37.     The NYPD members including Defendant Spalding then applied excessively handcuffs
        to Mr. Acosta.

5

38.     The Defendants injured Mr. Acosta's arm by holding him by his elbow, refusing to loosen his handcuffs, and by ripping out his hair.

39.     NYPD Lieutenant Schmidt also touched Mr. Acosta's buttocks.

40.     These NYPD members caused Mr. Acosta to suffer injuries to his left shoulder, neck, fingers, and wrists.

41.     NYPD members detailed Mr. Acosta at the scene, before Defendant Vasquez escorted  him to an NYPD transport van and took him to One Police Plaza and then another precinct where he was processed and further detained.

42.     Eventually, upon information and belief, a member of the NYPD issued Mr. Acosta a Summons and released him from custody.

43.     Upon information and belief, the Summons was dismissed.

44.     The NYPD members mentioned above detained and arrested Plaintiff without consent, probable cause, or lawful justification.

45.     The NYPD members mentioned above used unreasonable and excessive physical force in detaining and arresting Plaintiff.

ii.     ***India Wanebo.***

46.     On or about 10:00 p.m, on Atlantic Avenue between Boerum Place and Smith Street, NYPD Police Captain Hector Barias singled out Ms. Wanebo to NYPD Officer Prince O'Connor (Tax I.D. 940528).

47.     Officer O'Connor then grabbed Ms. Wanebo's right arm and pulled her.

48.      Defendant Noacki then attempted to place Ms. Wanebo in a chokehold while Officer O'Connor continued holding Ms. Wanebo's arm, causing injury to Ms. Wanebo's right shoulder.

49.     NYPD Police Officer Prince O'Connor (Tax I.D. 940528) then handcuffed Ms. Wanebo.

50.     Defendant Noacki and Police Officer O'Connor detained and arrested Ms. Wanebo without consent, probable cause, or lawful justification.

51.     Defendant Noacki and Police Officer O'Connor used unreasonable and excessive physical force in detaining and arresting Ms. Wanebo.

52.     Rather than issuing Ms. Wanebo a summons or other legal process on the street, NYPD officers loaded her into a prisoner transport vehicle and took her to One Police Plaza.

53.     Officer O'Connor offered Ms. Wanebo a phone call sometime around the hours of 3:00 or 4:00 a.m.

54.     However, Ms. Wanebo was threatened that exercising this right would result in prolonged detention.

55.     At approximately 5:30 a.m. Police Officer O'Connor issued Ms. Wanebo a Desk Appearance Ticket bearing Arrest Number K20633686 and released her from custody.

56.     The Kings County District Attorney's Office declined to prosecute Ms. Wanebo's case.

### A. <u>The NYPD'S History of Mishandling Protests</u>

57. The extensive deprivations of constitutional rights suffered by protestors including the Plaintiffs, during the 2020 Protests are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, *inter alia,* protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in

2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

58. The NYPD response to the protests in New York City the summer of 2020 was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protestors' protested First Amendment activity.

59. For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray, riding horses into crowds and baton strikes to disperse protestors, and kettling to move protestors from specific locations to effectuate mass arrests. [1]

60. The next year, during the police "Operation Overload II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of kettling tactics, excessive force and mass arrests, and excessive and unreasonable detention. [2]

61. The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004. [3]

62. Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild- New York City

---

[1] See, e.g., N.Y. Civil Liberties Union, Arresting Protest (2003), available at https://www.nyclu.org/default/files/nyclu_arresting_protest.pdf.
[2] See, e.g., N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), available at https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[3] See, e.g., *Callaghan v. City of New York*, 07 Civ. 9611 (PKC) (JLC) (S.D.N.Y.).

Chapter Legal Observers, as well as kettling tactics to move protestors or initiate mass arrests.[4]

63. Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

64. Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as have the Plaintiffs in this case.

65. In many these cases defendants employed tactics developed and modified over the course of many years by Defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

    a) *Mandal v. City of New York.*, 02-cv-1234 (WHP) (FM) (S.D.N.Y) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g. "Mandal I,"* No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 02-cv-6537 (WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgement on plaintiff's Fourteenth Amendment Equal Protection and First Amendment- based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"; *Mandal v. City of New York ("Mandal II")*, No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("Mandal II") (noting that approximately 38 Mandal plaintiffs prevailed at trial on claims that "the City had

---

[4] See *People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b) *Barley v. City of New York,* 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protestors who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c) *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia,* that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including defendant Monahan, arrested them and "the police deliberately held [protestors] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d) *Haus v. City of New York*, 03-cv-4915 (RWS) (MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to arrestees to delayed to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al., 04-cv-0665 (RWS) (S.D.N.Y.);*

e) *Kunstler v. City of New York,* 04-cv-1145 (RWS) (MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising Monell and other claims similar and related to the policies and practices complained of herein such as encircling protestors, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest.

f) *MacNamara v. City of New York,* 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), Abdell v. City of New York, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), Schiller v. City New York, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), Kyne v. Wolfowitz, 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, policies related to, the RNC in New York City in 2004, See, e.g., Schiller, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan 23, 2008) (nothing the City's consent to amendment of complaints in RNC cases to add, inter alia, "constitutional challenges to the defendants' alleged practice of detaining…all persons in connection with the RNC…no matter how minor the infraction, rather than issuing summonses on the street"); McNamara v.

City of New York, 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan handcuffed with plastic flex cuffs[.]"); Dinler, No. 04-cv-7921 (RJS)(JCF), 2021 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgement on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g) *Callaghan v. City of New York,* 07-cv-9611 (PKC)(JLC) (S.D.N.Y) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading Monell claims virtually identical to the core Monell claims pleased herein));

h) *Osterhoudt v. City of New York,* et. al., No. 10-cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendant's motion to dismiss Monell claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

i) Despite (then-Mayor Michael Bloomberg's recognition that "the majority of the [OWS] protestors have been peaceful and responsible," [5] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related policies, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgements and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco*, 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions;

j) In *Peat v. City of New York*, No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $ 598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk,[6] encircled them on three sides and

---

[5] Michael Bloomberg, Michael Bloomberg's Statement on the Zuccotti Park Clearance, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zucotti-park.
[6] In March and April 2012, NYCLU issued Free Speech Threat Assessments detailing the NYPD's restriction on protestor activity and engaging in a manner to obstruct protestor's ability to engage in First Amendment activity and

a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or path of egress as members of the scooter task force blocked the protestors path of egress;

k) Other OWS-related cases have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial; *Packard v. City of New York* 15-cv-7130 (S.D.N.Y.) (AT) and *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT);

l) The Plaintiffs in *Case, et al. v. City of New York, et al,* 14-cv-9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including Monell claims with much in commons with many of those raised herein. *See Case v. City of NY*, 233 F. Supp. 3d 372 (SDNY 2017); 408 F. Supp. 3d 313 (SDNY 2019);

m) The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, failure to provide reasonable dispersal orders and opportunity to disperse, unnecessary and excessive force used on protestors and overall efforts of the NYPD to deter and demoralize protestors. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v. NYC*, 13-cv-(RWS); *Crisp v. NYC*, 12-cv-5482 (RWS); *Dedrick v. NYC*, 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992 (RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

n) Those cases OWS related cases referenced herein, *Gerskovich, Packard, Case Peat*, the Union Square Litigations, as well as several other OWS-related cases, included failure to train Monell claims concerning protest activity that are similar to the Monell claims in this litigation;

o) The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled Arresting Protest, published April 2003, available at https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_portest.pdf;

p) The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled Rights and Wrongs at the RNC, published in 2005, available at

---

identified how executive "supervising officers, at random and without warning, pointed to protestors they wanted arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration." http://www.nyclu.org/en/nyc-free-speech-threat-assessment.

https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_r
nc.pdf;

q) The incidents discussed in the research compiled by the Global Justice Clinic at
the New York University School of Law and the Walter Leitner International
Human Rights Clinic at the Leitner Center for International Law and Justice at
Fordham Law School in their publication titled Suppressing Protest: Human
Rights Violations in the U.S. Response to Occupy Wall Street, published July 25,
2015, available at http://hrp.law.harvard.edu/wp-
content/uploads/2013/06/suppressing-protest-2.pdf; and

r) *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of
Long Range Acoustic Device ("LRAD") against perceived "group" for crowd
control purposes, including Monell allegations challenging many of the same
policies and practices herein, see, e.g., First Amendment Complaint at Paragraph
415).

**B.  NYPD's Permissive Response to Pro-Police and Other, Similar Demonstrations**

66. The NYPD's violent response to protests against police brutality was dramatically different

from their response to other kinds of protests and rallies.

67.  On July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker

Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making

racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The

NYPD made no arrests at the rally.[7]

68. On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge,

Brooklyn. The march was attended by counter protestors organized against police brutality.

Though members of the pro-police group shouted racist and homophobic slurs at the counter

protesters and assaulted them in view of NYPD officers, only two people were arrested –

---

[7] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against
Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-
brooklyn-dyker-heights.

both Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[8]

69. In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[9]

70. On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[10]

71. On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her and police threw her to the ground.[11]

---

[8] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge.
[9] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown.
[10] AP, *Jews For Trump car parade stirs protests, fights across NYC*, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/
[11] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges, Gothamist*, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

72. On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[12][13]

73. The NYPD has a history of treating even right-wing extremists more permissively. This pattern can be observed from the 1990s to the present.

   a. In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

   b. In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[14],[15]

   c. More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence, but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[16] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[17]

---

[12] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873

[13] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid-orders-once-again/2762850/

[14] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson

[15] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/

[16] Jake Offenhartz, *NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video*, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video

[17] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, Gothamist, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

**C.  <u>The NYPD'S Failure to Train Regarding Protest Policing</u>**

74. Since at least the 1990s, the NYPD had failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

75. In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

76. In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

77. Upon information and belief, to this day, that documents forms the core the NYPD protest response-related training.

78. The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, including by staging overwhelming presence and force at protest activity, as well as making early and "proactive" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

79. Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – (using the training's terminology) "disperse and demoralize" protestors.

80. These disperse and demoralize tactics and trainings have persisted through the present including on June 4, 2020 in Mott Haven as exemplified by the experiences of Jones,

Williams, Roman, and other protestors who attended said protest and those of others in the summer of 2020. [18]

81. Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

82. However, neither the Disorder Control Guidelines, nor upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

83. On information and belief, there was, and is, virtually no NYPD training – and certainly no meaningful NYPD training – focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protestors, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, use of force to make arrests, issuance of summons, issue of flex cuffs, mass arrests, and the like.

84. Defendants' failures to train, supervise and/or retrain led to violations of Plaintiffs' rights in this case, include, *inter alia,* the following:

   a) The failure to provide constitutionally meaningful dispersal disorders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply and the like;

   b) The failure to make clear the need for individualized probable cause to arrest in a protest context;

---

[18] See NYPD Responsible Investigation, New York State Officer of the Attorney General, Preliminary Report on Investigation into NYPD interaction with protestors, archive of written testimony incorporated herein by reference.

c)  The failure to provide training on the needs for fair warning and a meaningful opportunity to comply with police directions as a prerequisite for probable cause to arrest for a Curfew Order violation;

d)  The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

e)  The failure to provide training with regard to the proper application and removal of flex-cuffs, including how to measure the appropriate tension on flex cuffs; how to assess the need to remove flex-cuffs; how long flex-cuffs may be worn before a significant risk of nerve damage develops; the safest types of removal equipment to use and how to use removal equipment properly so as not to accidentally tighten flex-cuffs further in the process of removal; providing officers with necessary tools to remove or loosen flex-cuffs;

f)  The failure to provide training on the importance and need for NYPD members to wear masks during the COVID-19 pandemic, to provide masks for arrestees, and to allow arrestees to engage in mask-wearing, social distancing, handwashing, and other similar safety measures in light of the COVID-19 pandemic;

g)  The failure to provide training on the duty to intervene, stop, mitigate, and report officers who use excessive force while policing said event;

h)  The failure to provide training in de-escalation techniques;[19]

i)  The failure to provide training in the duty not to use excessive or unnecessary force; and

j)  Failures to supervise and discipline NYPD members for misconduct at protests, including false arrests, mass arrests, uses of force, and subjecting arrestees to unduly long, onerous, and unsafe arrest processing.

85. Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

---

[19] *See* New York City Department of Investigation Office of the Inspector General for the NYPD (OIG-NYPD), "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," October 2015, *available online at* https://www1.nyc.gov/assets/doi/reports/pdf/2015/2015-10-01-Pr_uofrpt.pdf (finding, *inter alia,* that NYPD use of force policy is vague and imprecise, and provides insufficient instruction on de-escalation).

86. The SRG, deployed around the City at protests in 2020 including the protest that is the subject of this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

87. The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

87. In response to the public's skepticism that the SRG would be used to crack down on protests, then- Chief of Department James O'Neill stated: "They will not be involved handling protests and demonstrations. They'll have no role in protests. Their response is single-fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city." [20]

88. However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

89. Upon information and belief, SRG members, including many of those deployed to the protests in 2020 that are the subject of this lawsuit, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits. [21]

90. SRG members are meant to have additional DCU training.

91. Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

---

[20] Ben Yakas, NYPD: Fine, Maybe We Won't Police Protests With Machine Guns, Gothamist, Jan. 30, 2015, available at https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine-guns.
[21] Ali Winston, NYPD Unite At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct Histories, The Appeal, Oct. 15, 2020, available at https://theappeal.org/nypd-srg-misconduct/.

92. However, upon information and belief, many of the officers deployed to respond to the protests in 2020, including Mott Haven, did not even receive that training, which was supposedly required of them.

93. As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received in the Academy. [22]

94. Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with crowd control while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgements and settlements.

95. Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors – including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

96. For example, in an March 17, 2006 New York Times article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of

---

[22] OCC Report at 37.

2002 WEF after-actions reports in then-ongoing litigation, *Allen v. City of New York*, 03-cv-2829 (KMW) (GWG) (SDNY). [23]

97. Those reports praised employing militarized tactics such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such as armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests in order to have a "powerful psychological effect" on protestors.

98. After the 2002 WEF after-action reports were disclosed in Allen and the 2004 RNC-related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, the NYPD opted to discontinue creating such reports, documented and assessed the NYPD's protest policing-related policies and tactics.

99. Upon information and belief, according to the Corporation Counsel's report, NYPD records do not show any protest-related after action reviews undertaken between the 2004 Republican National Convention until the events of the George Floyd protests.

100.    Nevertheless, upon information and belief, at prior to and during the summer of 2020 protests, Defendant City policymakers would routinely receive reports regarding arrests made in connections with First Amendment assemblies. Said "internal reports" including but not limited to: Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event;

---

[23] Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest, "N.Y. Times, March 17, 2006, available at https://www.nytimes.com/2006/03/17nyregion/police-memos-say-arrest-tactics-calmed-protst.html.

and/or other reports including information arrests, use of force protest arrest processing, and/or prosecutions.

101.    Despite the wealth of evidence of NYPD members' historical brutality against protestors, Defendant City has ignored, and/or failed to utilize relevant information, including information gleaned from complaints, investigations, news coverage reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it related to constitutionally complaint protest policing, and policing in general such as de-escalation techniques and proper use of force.

102.    For example, in a deposition in *Packard v. City of New York,* 15-cv-7130 (S.D.N.Y.) (AT), a witness for the City of New York testified that in regard to protest police training it did not review (i) decline to prosecute decisions, (ii) conviction conversation rates or (iii) allegations and settlements in lawsuits relating to protests.

103.    As another example, Defendant City apparently does not take allegations in lawsuits filed by protestors claiming they were falsely arrested during protests into account in considering its protest policing-related polices and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

104.    For example, in a 2017 deposition, a Fed. R. Civ. P. 30(b) (6) witness designated to testify on sidewalk policy protesting, dispersal orders, and training on probable cause standards for crimes commonly charged in protest policing by the Defendant City could identify no impact that litigation against City between 2000 and 2011 had on Defendant City's relevant polices, practices, customs, or NYPD training.

105.    Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests." [24]

106.    At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests-despite having received clear notice that NYPD policing of protests has caused the systemic violations of protestors' constitutional rights for years – demonstrates both a history and a policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other related rights of Plaintiffs and other  similarity injured protestors.

**D.  The NYPD's Policy and/or Practice of Using Excessive Force to Control the Speech of Protestors**

107.    Defendants used types and levels of force that were excessive and unnecessary force against the Plaintiffs and other similarity situated protestors.

108.    In many cases, those uses of force were in contravention of, or inconsistent with, related, written NYPD polices and/or training.

109.    Upon information and belief in many cases, defendants failed to document, and/or require that fellow defendants and/or fellow officers' document, uses of force in accordance with related NYPD policies and/or training.

110.    Further, upon information and belief, the defendants used force against plaintiffs based on their position in or proximity to a perceived group, without first having given the

---

[24] OCC Reports at 2, 30.

perceived group clearly communicated prior notice as well as a meaningful opportunity to comply with police orders and/or dissociate with the perceived group.

111.     Defendants used types of force, such as deploying pepper spray or mace, that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances.

112.     Additionally, Plaintiffs and others arrested at the protest that are the subjects of this litigation were handcuffed with their wrists together and their hands behind their back with plastic flex-cuffs for hours.

113.     In many cases, Plaintiffs and/or other arrestees complained about the fact that their flex-cuffs were too tight causing them pain and/or causing them injury.

114.     Specifically, because they were arrested at a protest, Plaintiffs were subjected to tight and extensive time being held in flex-cuffs pursuant to defendant's Protest Arrest Processing Policies.

115.     Defendant City did not supply Defendants with enough cutting tools with which to loosen or remove flex-cuffs, or any flex-cuffs pads, which are designed to prevent the very types of injuries Plaintiffs and other arrestees suffered as a result of having flex-cuffs applied to them.

116.     It was no secret to Defendants that using flex-cuffs to restrain protestors- including without providing adequate numbers of cutting tools or any protective padding – would result in injuries to protestors, of the sort that appropriate policies, training, and/or supervision would have been avoided.

117.    For example, *Burley v. City of New York*, 03-cv-2915 (WHP) (FM) 2005 WL 668789

(S.D.N.Y. March 23, 2005) was a class action arising from mass arrests of over 200

demonstrators during 2002 WEF in New York City challenging, *inter alia,* the NYPD's then-

policy and practice of using plastic flex cuffs as "unreasonable and excessive because of the

manner in which the handcuffs were applied and the length of time for plaintiffs were

handcuffed."

118.    Plaintiffs in *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and

other related cases arising from alleged false and retaliatory arrests in connection with police

responses to protests on April 7, 2003, also raised Monell claims around NYPD members'

use of extremely tight, plastic handcuffs.

119.    Additionally, in *McNamara v. City of New York*, 04-cv-9216 (RJS) (JCF) (S.D.N.Y.), the

Court certified a "Conditions of Confinement Class, comprising all RNC arrestees who were

handcuffed with plastic flex cuffs." See McNamara v. City of New York, 275 F.R.D 125,

154 (S.D.N.Y. 2011)

120.    Those cases, and many others, challenged the City's and NYPD's policies and practices

regarding the use of flex-cuffs to restrain protestors, and put the defendants in this case on

notice of the potential for injury and harm suffered when the flex cuffs are applied

improperly, and for too long a period of time.

121.    Relatedly, the DOI Report found, "When voicing those concerns to their arresting

officers or other officers in the area, arrestees were told that the officers lacked the necessary

equipment to remove the flex-cuffs. Arrestees therefore had to wait, oftentimes for long

periods, until they got to their respective arrest processing center so that flex-cuffs could be removed." [25]

**E.  Defendants' Policies And Practices Regarding Arrests — Including Mass Arrests — Without Fair Warning Or An Opportunity To Comply.**

122.   As set forth in this complaint the NYPD used a tactic known as kettling to surround, trap and prevent movement by the protestors from leaving the "kettle" area.

123.   Defendants used this tactic at prior protests as well.

124.   Not only did Defendants not allow the protestors to leave the kettled area prior to the 8:00 p.m. curfew, they also failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making arrests where such notice and opportunity were required.

125.   As a result, most of the protestors at Mott Haven (and in other protests which preceded it) were arrested in connection with perceived violations of Mayor de Blasio's Curfew Orders, or for perceived violations of New York Penal Law 240.20(6) (Disorderly Conduct – Failure to Obey Lawful Dispersal Order), yet Defendants failed to give constitutionally meaningful and adequate dispersal order and meaningful opportunities to disperse prior to making such arrests, and/or ensure that each such arrested Plaintiff had the state of mind required for such arrest.

126.   With respect to de Blasio's Curfew Orders, the plain language of de Blasio's Curfew Orders required both (a) a knowing violation of the Executive Order prior to any arrest and

---

[25] See, e.g., DOI Report at 42. See also, AG Report at 29 ("Officers kept the [flex-cuffs] on their wrists even after they were placed in cells, which, for some, cut off their circulation or caused other injuries to their wrists, including cuts and nerve damage.")

(b) that any arrest could only follow a dispersal order, a meaningful opportunity to disperse, and a person's refusal to comply with the order.

127.    As pled elsewhere herein, Defendants enforced the Curfew Orders by arresting Plaintiffs and other protestors without first ensuring that they had been given dispersal orders, meaningful opportunities to disperse, and that their refusal to comply was either knowing or voluntary. In sum protestors were arrested under circumstances in which Defendants had not ensured that arrestees had knowingly violated the Curfew Orders.

128.    That enforcement was consistent with official NYPD policy, as set out in the allegations regarding the FINEST message issued June 3 above.

129.    That is, NYPD issued a FINEST message that, when read in conjunction with an earlier message stating that protesters must be given an order to disperse before a curfew arrest, authorized and adopted a policy of arresting protesters with no order to disperse or opportunity to comply.

130.    For example, in a September 16, 2020 letter from NYPD Deputy Commissioner of Legal Matters Ernest F. Hart to Ida Sawyer, Acting Crisis and Conflict Director, Human Rights Watch,[26] Deputy Commissioner Hart stated that officers who merely "observed individuals who were not essential workers in public…[t]hat observation provided officers with probable cause to take, at a minimum, enforcement for Administrative Code § 3-108, Violating a Mayoral Executive Order, a 'B' Misdemeanor."

131.    Additionally, in many cases, Defendants enforced other provisions of New York law against Plaintiffs and other perceived protesters without probable cause and/or without first

---

[26] Available at https://www.hrw.org/sites/default/files/media_2020/09/Annex%20II_0.pdf.

having given constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests.

132.    For example, with respect to protesters at other protests who were arrested in connection with perceived violations of P.L. § 240.20(5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic), Defendants failed to ensure that each such arrested Plaintiff had caused a criminally significant blockage of traffic, and/or to ensure that each such arrested Plaintiff had the state of mind required for such arrest.

133.    By way of further example, with respect to protesters at other protests who were arrested in connection with perceived violations of New York Vehicle and Traffic Law § 1156(a) (Pedestrians on Roadway), Defendants failed to ensure that each such arrested Plaintiff had notice that they were allegedly violating the law by walking along and/or upon a roadway and/or a meaningful opportunity to conform their conduct to the law in order to avoid being arrested.

134.    Defendants also enforced provisions of New York law similar to those for which Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with – for example, VTL § 1156(a), which involves walking along or upon a roadway when an adjacent and usable sidewalk is available – the equivalent of jaywalking, an everyday offense that Defendants all but ignore in the City.

135.    And throughout the City, during the protests, very few if any non-protest-related arrests were made for curfew violations.

136.    Similarly, and upon information and belief, Defendants made few if any non-protest-related arrests for curfew without providing opportunities to disperse.

137.    Defendants employed a crowd control tactic in which Defendants pushed and/or corralled and/or otherwise physically trapped perceived groups including Plaintiffs and other perceived protesters, including by kettling, without first having given Plaintiffs and the others so pushed and/or corralled and/or trapped meaningful notice and an opportunity to disperse or otherwise change their conduct in order to avoid being so pushed and/or corralled and/or trapped.

138.    Defendants thus acted with a policy, custom or pattern of trapping protestors prior to curfew and then enforcing said curfew by arresting those who were trapped and not permitted to leave.

139.    The City was deliberating indifferent to this practice, and despite knowing that if was occurring, took no steps to stop it from continuing.

F.    **Defendants' Protest Arrest Processing Policies and Practices.**

140.    Defendants arrested Plaintiffs for alleged offenses which New York Criminal Procedure Law § 150.20 required them to grant Plaintiffs summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

141.    However, because Defendants arrested Plaintiffs and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, which involved, among other components, placing Plaintiffs and other arrestees in flex-cuffs and removing them from the street to a centralized arrest processing location such as a Mass Arrest Processing Center ("MAPC"), where Defendants subject them to large-scale arrest

processing procedures and Mass Arrest Processing Plan ("MAPP") rather than issuing them summonses, and releasing them from custody, on the street.

142.    Additionally, as a result, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants subjected Plaintiffs to flex-cuffing as well as unreasonably lengthy, onerous arrest processing, significantly increasing the amount of time they would otherwise have been in custody and exposing them to inappropriate and especially hazardous conditions of confinement, as well as searches of their persons and property, and/or seizures and/or retentions of their property without adequate pre- or post-deprivation notice and/or opportunity to be heard to challenge the grounds for seizing and/or retaining the property.

143.    In some cases, NYPD members destroyed and/or damaged property belonging to Plaintiffs and other arrestees.

144.    In other cases, NYPD members seized and retained property from Plaintiffs and other arrestees without providing them with the NYPD paperwork required by NYPD policies, practices, and procedures to retrieve property seized by NYPD members.

145.    In still other cases, NYPD members seized and retained property without providing Plaintiffs with a meaningful opportunity to retrieve it, for example because the location at which Defendants were retaining the property was closed.

146.    The conditions of confinement were unsafe and overcrowded, particularly in the context of the COVID-19 pandemic, and/or filthy and/or unsanitary; and lacked appropriate access to phone calls, food, water, bathrooms soap and/or hand sanitizer, other hygienic products such as tampons, and/or other basic necessities.

147.    With particular respect to the COVID-19 pandemic, during Plaintiffs' confinements, the State of New York, and Defendant City, had advised people to comply with social distancing, to wear masks, and to engage in practices such as hand-washing; and Defendant City, as well as and other NYPD members, enforced Executive Orders issued by Mayor de Blasio requiring people to engage in social distancing and/or mask-wearing, all on an emergency basis.

148.    However, as part of Defendants' Protest Arrest Processing Policies and MAPP, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants transported Plaintiffs to a MAPC or other centralized arrest processing location, in close, forced proximity to other arrestees and NYPD members, many of whom were not wearing masks, rendering social distancing impossible.

149.    Relatedly, many Defendants and other nearby NYPD members were not wearing masks while arresting and/or using force on and/or detaining Plaintiffs.

150.    Also relatedly, Defendants and other NYPD members removed masks many Plaintiffs and other arrestees who had masks at one point prior to or during their arrests or detentions.

151.    Also as part of Defendants' Protest Arrest Processing Policies and MAPP, Defendants subjected Plaintiffs and other arrestees to conditions of confinement in which they were unable to wash their hands or otherwise engage in other, similar hygienic practices that the State and City were recommending for public health and safety.

152.    Defendants knew or should have known that, as a result of subjecting Plaintiffs and other arrestees to Defendants' Protest Arrest Processing Policies and MAPP, they would deprive Plaintiffs and other arrestees of basic needs, including for example the need to stay safe from

COVID-19, as well as unreasonable risks of serious damage to their physical and/or mental health or safety through potential exposure to COVID-19.

153.   Defendants acted intentionally to impose those conditions because they subjected Plaintiffs and other arrestees to Defendants' Protest Arrest Processing Policies and MAPP.

154.   Additionally, Defendants recklessly failed to act with reasonable care to mitigate the risks that the conditions posed even though they knew or should have known that they posed excessive risks to Plaintiffs' physical and/or mental health or safety through potential exposure to COVID-19.

155.   Moreover, the risks were obvious and apparent, including based on the State and City policies and practices related to COVID-19 safety, and common sense.

## G.   Defendants' Failure to Monitor And Supervise NYPD Members' Protest Policing

156.   Although defendants City and other policymakers actually knew, or should have known, that NYPD members were engaging in or had engaged in the unconstitutional conduct complained of herein, they failed to monitor, supervise, and/or discipline NYPD members who directed, engaged, or observed such conduct.

157.   For example, despite statements made by former Mayor Bill de Blasio and former Commissioner Dermot Shea in the media indicating they had knowledge of events related to violence and mass arrests at the protests as they were unfolding, and the wealth of video and other evidence that has been widely available in their intervening months, upon information and belief, virtually no NYPD members have need meaningfully investigated or disciplined related to their conduct.

## H.   Some Reports and Investigations into the 2020 Protests

158.    In July 2020, the New York State Office of the Attorney General ("the AG") issued a preliminary report on the NYPD's response to the May and June protests ("the AG Report").[27]

159.    The AG Report found that most complaints received by the AG were allegations of excessive force, kettling, false arrests, and excessive force against protestors as well as similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observes, elected officials, and essential workers.

160.    The AG Report also found the pervasive use and misuse of tightly fastened flex-cuffs during arrest, NYPD officials covering their badge numbers, and failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

161.    In December of 2020, the NYC Department of Investigation issued a report examining the NYPD's conduct in response to the 2020 Black Lives Matter protests ("DOI Report").[28]

162.    The DOI Report found, inter alia, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[29]

---

[27] New York State Office of the Attorney General, Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd, ("AG Report"), July 2020, available at http://ag.ny.gov/sites/default/files/2020-nypd-report.pdf. The Plaintiffs herein incorporate by reference into this case the facts set forth in the AG Report.
[28] Margaret Garnett, Commissioner, New York City Department of Investigation, Investigation into NYPD Response to the George Floyd Protests, ("DOI Report"), Dec 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20GerogeFloyd%20Protests.12.18.2020.pdf
[29] Id. at 36.

163.    In addition to noting the heavy-handed response by the SRG at the 2020 protests, the DOI
        Report found that officers not from SRG lacked "any recent training related to protests."[30]

164.    The DOI found that NYPD policies do not have specific First Amendment protest
        expression policing and failed to distinguish polices for serious civil disorders and riots from
        those applicable to peaceful First Amendment expression.

165.    The DOI distinguished between protest facilitation and protest control, regulation, or
        suppression.

166.    The former is preferred to allow for First Amendment expression, the DOI Report found,
        but the NYPD employed protest control during the 2020 protests.

167.    According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047
        individuals were arrested during demonstrations.[31]

168.    The DOI also found that Black arrestees were disproportionately charged with felonies.[32]

169.    The DOI also found that "the force required to carry out a mass arrest was
        disproportionate to the identified threat," and "placed the burden of potential crime on a wide
        swatch of people who had no apparent connections to that potential criminal activity.[33]

170.    According to the DOI Report, between May 28 and June 20, 2020, the CCRB had
        received 1,646 protest-related allegations related to 248 incidents.[34]

171.    Defendant City and NYPD leadership and policymakers knew the department and its
        officers had problems with constitutionally policing protests but failed to adequately train
        and otherwise prepare its officers to respond to the Summer 2020 Protests, prevent its

---

[30] Id. at 61.
[31] Id. at 26.
[32] Id. at 27.
[33] DOI Report at 56.
[34] Id. at 28.

officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

## FIRST CLAIM FOR RELIEF

### Unlawful Seizure / False Arrest
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

172.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

173.    Defendants did not have probable cause to seize, detain, or arrest Plaintiffs.

174.    Defendants seized Plaintiffs without a written judicial warrant authorizing them to do so.

175.    Defendants' seizure of Plaintiffs was without privilege or lawful justification.

176.    Plaintiffs did not consent and were conscious of the confinement by Defendants.

177.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

178.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Excessive Force
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

179.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

180.     Defendants' use of force against Plaintiffs was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

181.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

182.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

### For Violations of Plaintiff's First Amendment Rights,
### Including Under Retaliation and Time/Place/Manner Theories of Liability
### *Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution*

183.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

184.     Defendants retaliated against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment.

185.     Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiffs' protected speech and/or conduct.

186.     Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected speech and/or conduct.

187.    Defendants engaged in the acts and omissions complained of herein in order to prevent
and/or discourage Plaintiffs from engaging in similar protected conduct in the future.

188.    Additionally, as discussed elsewhere herein, Defendant City designed and/or
implemented policies and practices pursuant to which those Defendants who implemented
them subjected Plaintiffs to violations of their First Amendment rights.

189.    Upon information and belief, Defendants engaged in the acts and omissions complained
of herein with respect to Plaintiffs' First Amendment-based claims—including the related
municipal liability claims involving the adoption of policies, practices, and/or customs and/or
related failures to train, supervise, and/or discipline—with malice.

190.    Defendants imposed restrictions on Plaintiffs' protected speech and/or conduct that
violated Plaintiffs' First Amendment rights, including, but not limited to, in subjecting
Plaintiff to excessive force, false arrest, excessive detention, malicious and false prosecution,
and in otherwise violating Plaintiff's rights and engaging in the acts and omissions
complained of herein.

191.    In addition to being retaliatory, the restrictions Plaintiffs complained of herein that
Defendants imposed on Plaintiffs' First Amendment rights to participate in, observe, and/or
stand nearby speech, conduct, association, and/or other expressive activities protected by the
First Amendment on the streets, were themselves regulations on Plaintiffs' protected conduct
that:

      a.    Were viewpoint discriminatory and/or otherwise not content-neutral, and were
not necessary, and precisely tailored, to serve compelling governmental
interests, and/or were not the least restrictive means readily available to serve
those interests; or, alternately,

      b.    Were content-neutral, but lacked narrow tailoring to serve a significant
governmental interest, in that they burdened substantially more protected
speech and/or conduct than necessary to serve those interests, and/or failed to

provide ample alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened; and/or

c.  Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's ability to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d.  Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

192.   As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

193.   Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## **FOURTH CLAIM FOR RELIEF**

### **Due Process**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution***

194.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

195.   As described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiffs violated their Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear

38

standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, often without fair warning.

196.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in seizing and/or retaining Plaintiffs' property and/or detaining Plaintiffs in the conditions as described subjected Plaintiffs to the violations of their Due Process rights described elsewhere herein.

197.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

198.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

**Equal Protection and Selective Enforcement**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fourteenth Amendment to the United States Constitution*

199.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

200.    As described above, in many cases, Defendants arrested Plaintiffs for alleged offenses in connection with which C.P.L. § 150.20 required that Plaintiffs receive summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken

directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

201.     However, because Defendants arrested Plaintiffs and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, rather than issuing them summonses, and releasing them from custody, on the street, while Defendants did not apply those same Protest Arrest Processing Policies to other similarly situated arrestees.

202.     Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and/or detaining and/or prosecuting Plaintiffs subjected Plaintiffs to the above-described violations of Plaintiffs' Equal Protection rights.

203.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

204.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SIXTH CLAIM FOR RELIEF

### Deprivation of Fair Trial Rights
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution***

205.     Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

206.     Defendants fabricated evidence of a material nature, likely to influence a jury's decision,

40

intentionally forwarded that evidence to prosecutors, as a result of which Plaintiffs suffered

liberty deprivations and other injuries.

207.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their

federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs

and expenses; and/or otherwise damaged and injured Plaintiffs.

208.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and

was of such a nature that punitive damages should be imposed against them.

### SEVENTH CLAIM FOR RELIEF

**Malicious Prosecution**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under
the Fourth and Fourteenth Amendments to the United States Constitution***

209.    Plaintiffs hereby incorporate by reference the allegations set forth in all preceding

and subsequent paragraphs as if fully set forth herein.

210.    Upon information and belief, Defendants misrepresented and falsified evidence to the

prosecutor and/or failed to make a full statement of the relevant evidence – including

potentially exculpatory evidence - to the prosecutor.

211.    Defendants were directly and actively involved in the initiation or prosecution of criminal

proceedings against Plaintiffs, including by supplying and creating false information to be

included in NYPD paperwork that was included in NYPD paperwork, providing falsely

sworn information in accusatory instruments, and/or providing false information to the

prosecutor.

212.    Defendants lacked probable cause to initiate and continue criminal proceedings against

Plaintiffs.

41

213.     Defendants acted with malice in initiating criminal proceedings against Plaintiffs.

214.     Notwithstanding Defendants' misconduct, the criminal proceedings against Plaintiffs were favorably terminated on the merits.

215.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

216.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.


**EIGHTH CLAIM FOR RELIEF**

**Municipal Liability**
*Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiffs' Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution*

217.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

218.     The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiffs to, including, but not limited to: uses of excessive force, and false arrests, and unreasonable restrictions on protesters' First Amendment-protected conduct, often without fair warning; employing crowd control tactics such as pushing, corralling, encircling, or otherwise trapping protesters, without fair warning; engaging in retaliatory and selective enforcement of the criminal laws against perceived participants in First Amendment assemblies, particularly Black Lives Matter and/or anti-police brutality protests, in the

42

absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations as to their perceived violations, without fair warning; using flex-cuffs for protest-related arrests, while failing to supply officers with protective padding and adequate numbers of cutting tools to loosen or remove flex-cuffs, and/or to ensure that such cutting tools are readily available when needed; failing to loosen or remove over-tight cuffs; and subjecting arrestees to lengthy detentions and lengthy detentions and arrest processing at centralized arrest processing locations, exposing them to searches, property seizures, and unhealthy and conditions of confinement, in lieu of brief street detentions.

219.   All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City and other policymaking officials; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

220.   As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

221.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## NINTH CLAIM FOR RELIEF

**Violations of New York State Law**
*Pursuant to the New York State Constitution and New York State Law*

222.    Plaintiffs incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

### *Respondeat Superior* Liability

223.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

### Assault

224.    Defendants committed assault within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

### Battery

225.    Defendants committed battery within the meaning of New York common law against Plaintiff by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

### New York Civil Rights Law § 79-P

226.    Prior to his assault, battery, and arrest, Plaintiff Acosta had been exercising his rights under New York Civil Rights Law § 79-P, the New Yorker's Right to Monitor Act, to

"capture or attempt to capture" law enforcement activity "by way of observation," and to that effect, he commented on misconduct.

227.    Prior to his assault, battery, and arrest, Mr. Acosta had not physically interfered with law enforcement activity or engaged in obstruction of governmental administration or other unlawful conduct.

228.    Defendants assaulted and battered Mr. Acosta, intentionally preventing him from further observing law enforcement activity.

**Conversion**

229.    Defendants committed conversion by intentionally taking possession of and/or interfering with Plaintiffs' personal property in derogation of Plaintiffs' rights.

**False Imprisonment and Unreasonable Detention**

230.    By the actions described above, the police officials described above did falsely arrest and/or imprison Plaintiffs within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so.

231.    Plaintiffs were conscious of the confinement and it was without their consent.

**Negligent Hiring, Training and Supervision**

232.    Upon information and belief, Defendant City supervised, and trained the police officials described above.

**Excessive Detention**

233.    Defendants deliberately detained Plaintiffs for excessive and unreasonably prolonged periods of time.

**Malicious Prosecution**

234.    Defendants commenced criminal proceedings against Plaintiffs maliciously and without probable cause.

235.    All charges were terminated in Plaintiffs' favor.

**Violations of the New York State Constitution**

236.    Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

237.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiffs' rights under those sections.

238.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

239.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs demand judgment against the individual Defendants and the City of New York as follows:

i.     Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

ii.    Actual damages in an amount to be determined at trial against the City of New York;

iii.   Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter*

*alia,* 42 U.S.C. §1988, New York Civil Rights Law § 79-P(3)(d), and New York common law; and

iv.     Such other relief as the Court deems just and proper.


Dated: New York, New York
        June 13, 2023


                                        **COHEN&GREEN P.L.L.C.**


                                        By: _____
                                        Elena L. Cohen
                                        J. Remy Green
                                        Jessica Massimi

                                        1639 Centre Street, Suite 216
                                        Ridgewood (Queens), NY 11385
                                            t: (929) 888-9480
                                            f: (929) 888-9457
                                            e: elena@femmelaw.com
                                               remy@femmelaw.com
                                               jessica@femmelaw.com

                                        **GIDEON ORION OLIVER**


                                        _____
                                        277 Broadway, Suite 1501
                                        New York, NY  10007
                                        t: 718-783-3682
                                        f: 646-349-2914
                                        Gideon@GideonLaw.com